**OLD BEN COAL CORPORATION,**
Petitioner,

v.

**INTERIOR BOARD OF MINE OPERATIONS APPEALS, UNITED STATES DEPARTMENT OF INTERIOR and Roger C. B. Morton, Secretary of the Interior, Respondents.**

Nos. 74–1654 to 74–1656.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1975.

Decided June 13, 1975.

Rehearing and Rehearing En Banc
Denied Oct. 2, 1975.

Thomas H. Barnard, Robert A. Meyer, Cleveland, Ohio, for petitioner.

Carla A. Hills, Asst. Atty. Gen., Judith H. Norris, Atty., Dept. of Justice, Washington, D. C., for respondents.

Before PELL, *Circuit Judge,* SPRECHER, *Circuit Judge,* and PERRY, *Senior District Judge.**

PERRY, *Senior District Judge.*

This is an appeal by petitioner Old Ben Coal Corporation [hereinafter "Old Ben"] from three separate decisions of respondent Secretary of the Interior [hereinafter "Secretary"] issued by the Secretary's delegate, respondent Interior Board of Mine Operations Appeals, United States Department of the Interior [hereinafter "Board of Appeals" or "Board"], affirming in each instance the decision of an Administrative Law Judge [hereinafter "ALJ"] upholding the validity of an "imminent danger" order of withdrawal issued by a Federal coal mine inspector under Section 104(a) of the Federal Coal Mine Health and Safety Act of 1969 [hereinafter "Act"] pertaining to an underground bituminous coal mine owned and operated by Old Ben.

This appeal involves three separate cases with similar backgrounds. Each case began when an authorized representative of the Secretary,—a Federal coal mine inspector with the Mining Enforcement and Safety Administration [hereinafter "MESA"],—issued a withdrawal order closing down a portion of a coal mine owned and operated by Old Ben. The mines which are involved in this appeal are subject to the mandatory health and safety standards of the Act, and to periodic inspection by MESA inspectors. Pertinent facts in each of the three separate cases are set out below.

*Appeal No. 74–1654.* During a periodic inspection of Old Ben Mine No. 26 on November 6, 1972, Inspector James Adkins issued an "imminent danger" order of withdrawal which cited the following conditions:

> Accumulations of loose coal and coal dust were present in rooms 27 and 28 of the 10, 11 and 12 north off the 16 east section. This loose coal and coal dust ranged in depths of from 4 to 18 inches in both rooms and was present from the conveyor belt inby to the faces of rooms 27 and 28, a distance of 140 feet in both rooms.

> Loose coal and coal dust were also present at the shuttle-car dumping station in room 29 for a distance of 20 feet ranging in depth from 4 to 20 inches, and loose coal and coal dust were also present at the shuttle-car dumping station at the conveyor belt tail piece section in depths ranging from 6 to 16 inches for a distance of 24 feet.

> A bolt was missing from the control panel of the No. 2138 shuttle-car. The outer insulation of the trailing cable to the No. 1587 shuttle-car had been damaged thus exposing the inner cables.

> Adequate belt isolation was not being achieved in that the metal stopping at the 750 feet mark of entry 10 (located between entries 10 and 11) had been damaged and partially knocked down.

Inspector Adkins ordered mine personnel to withdraw from the "10, 11 and 12 north off the 16 east" section of the mine. The cited conditions were abated and the order of withdrawal was terminated on the same day it was issued. Old Ben subsequently filed an application for review of the withdrawal order under section 105(a) of the Act, 30

---

* Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

U.S.C. § 815(a), contending that the cited conditions did not constitute an imminent danger because: (1) ventilation in the area was adequate at the time of inspection; (2) no measurable amounts of methane were present; (3) the allegedly missing bolt did not impair "permissibility" of the shuttle car as that term is defined in the Act; (4) the damage to the trailing cable was a temporary splice made in compliance with 30 C.F.R. 75.603; and (5) although there was improper belt isolation, the air passing through the belt entry did not reach the working face and did not create any condition of imminent danger.

A hearing on the merits was held on August 23, 1973. In his decision following the hearing, the ALJ found *inter alia* that: (1) MESA had established by a preponderance of the evidence that the conditions and practices cited in the withdrawal order constituted an imminent danger within the meaning of Section 3(j) of the Act, 30 U.S.C. § 802(j); (2) although there may have been adequate ventilation and no measurable methane at the time of the inspection, Old Ben's mine is a gassy mine which could liberate methane at any time; (3) the non-permissible shuttle car and damaged trailing cable were sources of ignition which in the presence of accumulations of inadequately rock-dusted loose coal and coal dust created a danger of a mine fire or explosion; and (4) Old Ben failed to prove by a preponderance of the evidence that the conditions and practices cited in the order did not constitute an imminent danger within the meaning of Section 3(j) of the Act, 30 U.S.C. § 802(j). Accordingly, the ALJ concluded that the withdrawal order was properly issued and dismissed Old Ben's application for review. The Board of Appeals affirmed the ALJ's decision, concluding that the decision was clearly supported by the Board's previous deci-

sions in *Eastern Associated Coal Corporation*,[1] and *Freeman Coal Mining Corporation*.[2] Old Ben thereafter filed its petition for review in this Court.

*Appeal No. 74–1655.* On September 5, 1972, during an inspection of Mine No. 21, Inspector Harry Greiner issued an "imminent danger" withdrawal order which cited the following conditions:

Coal float dust up to 4 inches in depth and a distinct black was deposited on rock dusted surfaces along the 56 south belt conveyor entry from the head roller to the 300 foot surveyor's tag, also around the belt drive and in the connecting crosscuts. Loose coal and coal dust accumulations were beneath the belt, and up to 2 feet in depth along the east side of 56 south belt for the length of the belt a distance of approximately 1,000 feet; float coal dust under and around the belt tail and outby for 50 feet up to 3 inches in height.[3]

These conditions were recorded in the mine examiner's book for 7 previous shifts.

Room Nos. 37 and 38 had accumulations of loose coal and dust along ribs and roadways from 3 to 6 inches in depth, and from the room neck inby a distance of 150 feet; rock dust applications were obviously inadequate; rock dust had been applied by hand and little or no rock dust was applied to the roof, ribs and floor generally. Samples were taken to substantiate the findings.

The cited conditions were abated and the withdrawal order was terminated the day following the issuance thereof. Old Ben filed an application for review of the order, contending that the cited conditions did not constitute imminent danger as defined in Section 3(j) of the Act. A hearing before ALJ Michels was held on December 4, 1973. In his decision

---

1. 2 IBMA 128, 80 I.D. 400, CCH Employment Safety and Health Guide, ¶ 16, 187 (1973).

2. 2 IBMA 197, 80 I.D. 610, CCH Employment Safety and Health Guide, ¶ 16, 567 (1973).

3. Although the last word in the first paragraph of the order in the copy submitted is almost illegible, it appears to be the word "height".

following the hearing, the ALJ found in pertinent part: (1) although there was some dispute as to the amount of the accumulation of loose coal and coal dust, there was no dispute that an accumulation did exist; (2) although there had never been a sudden release of methane in this mine, it is a gassy mine; (3) the accumulations under the belt were high enough to support the inspector's conclusion that a belt fire could occur; and (4) in the presence of the combustible materials observed, any fire or explosion would become a grave hazard. Accordingly, the ALJ concluded that an imminent danger had existed; that the inspector was thus justified in issuing the withdrawal order; and that Old Ben had failed to establish by a preponderance of the evidence that an imminent danger had not existed. The ALJ dismissed Old Ben's application for review. The Board of Appeals affirmed the decision of the ALJ, stating that by applying the test of imminent danger enunciated in *Eastern Associated Coal Corporation, supra*, the Board concluded that the cited conditions existing along the belt line supported the inspector's conclusion that an imminent danger existed. Old Ben thereafter filed the instant petition.

*Appeal No. 74–1656.* On October 4, 1972, after an inspection of Mine No. 26, Inspector Mike Krisfaluzy issued an "imminent danger" withdrawal order which cited the following conditions:

Accumulations of loose coal and coal dust were present along the ribs and floors starting from the 1550-foot station to inby room 38, ranging from 3 to 15 inches in depth for a distance of 67 feet, and from the tail sections to inby the tail sections for a distance of 165 feet including all crosscut ranging from 3 to 10 inches in depth. Rock dust was inadequate from the mouth of rooms 37 and 38 for a distance of 50 feet in room 37 and a distance of 42 feet in room 38. Rock dust was inadequate from the tail section to inby for a distance of 165 feet including all crosscuts. The 31 south haulage road was inadequately rock dusted for a

distance of 1350 feet in the 31, 32 and 33 South sections off the 6 main east entries.

Two portable oil cans did not have caps to enclose the containers in the 31, 32, and 33 south section off the 6 main east entries. 5 dust samples were taken to substantiate the findings.

The cited conditions were abated and the withdrawal order was terminated the following morning. Old Ben filed an application for review of the order, contending that the conditions or practices cited did not constitute imminent danger as defined in Section 3(j) of the Act. A hearing before ALJ Koutras was held on August 22, 1973. In his decision following the hearing, the ALJ found, *inter alia*, that the inspector's findings as to the loose coal and coal dust accumulations were supported by the record, and that the energized equipment and the belt tail piece were ignition sources. Based upon the foregoing, the ALJ concluded that the conditions cited constituted an imminent danger; that the withdrawal order was properly issued; and that Old Ben had failed to meet its burden of establishing that the conditions cited in the order did not constitute an imminent danger. Accordingly, the ALJ dismissed Old Ben's application for review. The Board of Appeals affirmed the ALJ's decision, stating that the decision of the ALJ is clearly supported by *Eastern Associated Coal Corporation, supra.* Old Ben thereafter filed this petition.

We are called upon to decide essentially three issues: (1) whether the Board of Appeals correctly interpreted the term "imminent danger" as used in Section 104(a) of the Act, 30 U.S.C. § 814(a); (2) whether, given the proper interpretation of "imminent danger", there was substantial evidence to support the Secretary's findings that an imminent danger existed in the petitioner's mines; and (3) whether the Secretary violated the Administrative Procedure Act by assigning the burden of proof to the petitioner in

the administrative review proceedings below.

### Legislative History

■ Old Ben asserts that "Section 104(a) of the Act, 30 U.S.C. § 814(a), entrusts to MESA inspectors the awesome power to peremptorily shut down businesses within an industry of critical national importance without notice or hearing if there presently exists, in the inspector's sole opinion, an 'imminent danger'". (Brief of Petitioner at 17). This assertion is correct, for the primary concern of Congress in enacting the Act is articulated in the following words of Section 2(a), 30 U.S.C. § 801(a):

Congress declares that—

(a) the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner;

The need for the Act was plainly stated by Secretary of the Interior Walter J. Hickel, who testified as follows before the General Subcommittee on Education and Labor:

Clearly, if we are to have any impact on the day-to-day accidents that cause most of our coal mine injuries and deaths, we need a law that gives broader enforcement power to the inspector and thereby provides stronger incentives for management and labor to think safety at all times. We must reduce injuries and eliminate the accidents that kill miners by the ones, twos, or threes as well as prevent major disasters.[4]

Clearly, the inspector is in a precarious position. He is entrusted with the safety of miners' lives, and he must ensure that the statute is enforced for the protection of these lives. His total concern is the safety of life and limb. On the other hand, the coal mine operator is principally concerned with dollars and profits. We must support the findings

and the decisions of the inspector unless there is evidence that he has abused his discretion or authority. We find no such evidence here.

### Imminent Danger

Old Ben strongly contends that in each of the three aforedescribed cases the conditions and practices cited in the orders of withdrawal failed to rise to the level of "imminent danger". The thrust of the argument is that the Board of Appeals construed Section 104(a) of the Act, 30 U.S.C. § 814(a), to permit the closure of mines when there is only a *remote possibility* of danger, not a reasonable likelihood. (Brief of Petitioner at 43). Old Ben contends, in short, that the term "imminent danger" was intended to apply to situations involving actual, *immediate* danger.

Old Ben contends at page 23 of its brief:

The legislative history of the Federal Coal Mine Health and Safety Act of 1969 clearly establishes that Congress did not intend that the mere presence of the most prevalent substances in a mine, loose coal and coal dust, serve as a basis for the issuance of a withdrawal order for imminent danger. In this regard, for instance, Representative Erlenborn of Illinois stated:

There is no imminent danger to the health or safety of miners because of an extra large concentration of dust in the mine. Many people relate the dust standards to such things as concentration of methane. . . . [B]ut a concentration of coal dust in a mine constitutes no imminent danger. 115 Cong.Rec. 31,586 (1969) (Remarks of Rep. Erlenborn).

The above-quoted remarks of Congressman John Erlenborn concerning the hazards of coal dust are immaterial to this appeal. A full review of the source cited

---

4. Hearings on H.R. 4047, H.R. 4295, and H.R. 7976 Before the General Subcomm. on Labor of the House Comm. on Education and Labor, 91st Cong., 1st Sess. at 50 (1969); H.R.Rep.

No. 91–563; 91st Cong., 1st Sess. at 59 (1969); reprinted in 2 U.S.Code Cong. & Admin.News, 91st Cong., 1st Sess. (1969) at 2507.

by Old Ben shows that these remarks were made in connection with the interim mandatory health standards and the problems of respirable dust and pneumoconiosis, for immediately following the above-quoted remarks, Congressman Erlenborn goes on to say:

> The fact is, a person would have to be subjected day in and day out to exposure over 15 or 20 years or more before evidence of pneumoconiosis would even begin to be ascertainable by X-ray and lung function tests. 115 Cong.Rec. 31,586 (1969).

Thus it is clear that Congressman Erlenborn's remarks were never intended to show,—as Old Ben misleadingly contends,—that accumulations of loose coal and coal dust were not imminently dangerous as factors which could contribute to mine fires or explosions.

■ Less than a year ago, in *Freeman Coal Mining Co. v. Interior Bd. of Mine Op. App.*, 504 F.2d 741 (7th Cir. 1974), we decided that the Board of Appeals had correctly interpreted the term "imminent danger" when it upheld the validity of a withdrawal order. There, as in Appeal No. 74–1655 here, the withdrawal order was based upon a finding by the inspector that an accumulation of float coal dust constituted an "imminent danger" within the meaning of the Act. The Board found that the float coal dust accumulation constituted an imminent danger. The dust was not in suspension, but this fact was discounted. Among the factors which the Board considered determinative of the issue were the large area covered—a length of 7200 feet—and the inherently gassy quality of the mine. In its decision the Board stated that "imminent danger", as used in the Act, relates to "the proximity of the peril to life and limb". The test for an imminent danger was phrased as follows:

> "[W]ould a reasonable man, given a qualified inspector's education and experience, conclude that the facts indicate an impending accident or disaster, threatening to kill or to cause serious physical harm, likely to occur at any moment, but not necessarily immediately? The uncertainty must be of a nature that would induce a reasonable man to estimate that, if normal operations designed to extract coal in the disputed area proceeded, it is at least just as probable as not that the feared accident or disaster would occur before elimination of the danger."

Freeman, the petitioner, contended that the Board misinterpreted the term "imminent danger" and that the term "imminent danger" applies only to "extreme and unusual situations where the conditions are such that a danger exists which has an immediate threat to cause injury or death", where "a catastrophe [is] near or present".

In reviewing the purpose, the legislative history, and the wording of the Act, we quoted the following passage from the Congressional Record:

> The definition of an "imminent danger" is broadened from that in the 1952 act in recognition of the need to be concerned with any condition or practice, naturally or otherwise caused, which may lead to sudden death or injury before the danger can be abated. It is not limited to just disastrous type accidents, as in the past, but all accidents which could be fatal or nonfatal to one or more persons before abatement of the condition or practice can be achieved. 115 Cong.Rec. 39985 (1969).

■ In *Freeman*, we noted that the language of the Act itself supported the Board's interpretation, for the Act calls for the "immediate" withdrawal of all persons when an "imminent" danger is found to exist, and only the withdrawal action is phrased in terms of "immediate". We said that this is entirely reasonable since if withdrawal could not be ordered unless the danger, too, was "immediate", the expected accident would, likely as not, occur during the withdrawal, thereby injuring miners. Moreover, we noted that under Section 104(d) of

the Act, 30 U.S.C. § 814(d), persons necessary to eliminate the danger are permitted to remain in the affected area for that purpose, and that it is questionable whether anyone would remain in a mine for any purpose if there was an "immediate" danger. We then concluded:

. . . A reading of the entire section in light of the Act's humane purpose, makes clear that the Board has correctly construed "imminent danger" as being a situation in which a reasonable man would estimate that, if normal operations designed to extract coal in the disputed area should proceed, it is at least just as probable as not that the feared accident or disaster would occur before elimination of the danger. [Footnote omitted.] 504 F.2d at 745.

Thus it is clear that in *Freeman* we rejected the contention that "imminent danger" was intended to apply only to situations involving immediate danger. We see no reason to deviate now from our holding in *Freeman*.

■ As for Old Ben's contention that the test for "imminent danger" should be limited to a "reasonable likelihood" of danger, we note that a similar contention was recently rejected by the Court of Appeals for the Fourth Circuit in *Eastern Associated Coal Corp. v. Interior Bd. of Mine Op. App.,* 491 F.2d 277 (4th Cir. 1974), where the petitioner sought review of a decision by the Board sustaining an order of withdrawal, and the dispute revolved about what is an "imminent danger". The petitioner Eastern contended, as Old Ben contends here, that a danger is imminent only if there is a reasonable likelihood that it will result in injury before it can be abated. The Court disagreed, accepting instead the Board's interpretation. Said the Court:

. . . The Secretary determined, and we think correctly, that "an imminent danger exists when the condition or practice observed could reasonably be expected to cause death or serious physical harm to a miner if *normal*

*mining operations were permitted to proceed in the area before the dangerous condition is eliminated."* 491 F.2d at 278.

In Appeal No. 74–1654, both the ALJ and the Board applied the *Freeman* test to determine whether a valid imminent danger order was issued. In Appeal No. 74–1655, the ALJ applied the *Freeman* test while the Board applied the test enunciated by the Board in *Eastern Associated Coal Corporation,* 2 I.B.M.A. 128, which test was upheld in *Eastern Associated Coal Corp. v. Interior Bd. of Mine Op. App., supra.* In Appeal No. 74–1656, the ALJ adopted both the *Freeman* and *Eastern* tests, and the Board found that the ALJ's decision was clearly supported by the *Eastern* test.

For all of the foregoing reasons we conclude that the Board of Appeals correctly interpreted the term "imminent danger" in the three cases before us.

### Sufficiency of the Evidence

■ This Court must affirm the Board's decisions if they are supported by substantial evidence. Section 106(b) of the Act, 30 U.S.C. § 816(b). We conclude that the testimony of the witnesses in each of the three cases before us furnishes substantial evidence to support the Board's decisions that an imminent danger existed when the orders of withdrawal were issued.

■ In Appeal No. 74–1654, the ALJ found that accumulations of inadequately rock-dusted loose coal and coal dust existed; that the absence of a bolt from the control panel of a shuttle car, together with the existence of a damaged trailing cable, constituted sources of ignition; that coal was being mined; and that the coexistence of the accumulations of coal and coal dust and the sources of ignition created a danger of fire or explosion.

■ Old Ben contends that accumulations of coal and coal dust *per se* cannot create an imminent danger, and that there was no imminent danger because the damaged trailing cable and the ab-

sence of the bolt did not constitute an actual ignition source. A similar argument was rejected by this Court in *Freeman, supra,* where the petitioner contended that there was neither suspension of float coal dust in air, nor ignition, nor a concentration of methane gas at the time the withdrawal order was issued. We said:

> The lack of suspension and ignition indicates only that an explosion might not have occurred immediately. . .
>
> Moreover, the lack of methane gas in the mine during the time of the inspection is not determinative. The evidence indicated only that the ignition of methane gas is the most common cause of float coal dust explosions, not that it is the only source of an ignition. . . . 504 F.2d at 746–747.

We agree with the respondents that when dangerous accumulations of coal dust exist, an inspector should not have to wait until a source of ignition has caused a fire or explosion before he takes corrective action, and that the inspector in this case could reasonably conclude that there was a reasonable expectancy that an inadvertent ignition could have occurred before the accumulations could have been abated and repairs could have been made to the shuttle car and trailing cable.

■ In Appeal No. 74–1655, testimony of the witnesses supported the following findings of the ALJ: inadequately rock-dusted accumulations of coal, coal dust, and float coal dust existed along 1300 feet of a conveyor beltway; some of the accumulations lay under the belt line and were of sufficient depth for the inspector reasonably to expect that a belt fire could occur before the accumulations could be cleaned up; Mine No. 21 has been classified as a "gassy" mine. Evidence was disputed on the question of whether or not the belt was running at the time the accumulations were discovered. The ALJ discounted this fact, however, concluding that even if the belt was stopped the inspector would have to ensure that it remained stopped until the accumulations were removed.

■ Old Ben contends that there was no imminent danger because: (1) there was no actual ignition source; (2) there was no appreciable methane present; and (3) there was no evidence that the belt or the belt rollers had "heated up". Our decision in *Freeman, supra,* disposes of the first two contentions. As for the third contention, we think that an inspector should not wait until the rollers rub the coal to the point where friction creates a spark before taking corrective action.

■ In Appeal No. 74–1656, the following evidence was adduced: inadequately rock-dusted accumulations of loose coal and coal dust were present in Mine No. 26; Mine No. 26 is a "gassy" mine and emits methane freely; although mining operations had not started at the time the withdrawal order was issued, men were present and working; energized equipment,—including a bobcat front-end loader and a belt tail piece, —were present, and the bobcat loader was running; the belt tail piece was in contact with the aforementioned accumulations. The ALJ found that the energized equipment, particularly the bobcat loader and the belt tail piece, constituted possible sources of ignition, and that these sources of ignition, together with the existence of the accumulations of inadequately rock-dusted loose coal and coal dust, created a danger of explosion or fire.

Old Ben contends that the withdrawal order was issued solely on the basis of deposits of loose coal and coal dust, and that neither the inspector nor the ALJ found any *actual* ignition sources which, together with the deposits, could create the hazard of fire or explosion cited as the basis for the withdrawal order. Again, this Court's decision in *Freeman* disposes of these contentions.

### Burden of Proof

Section 105(a)(1) of the Act, 30 U.S.C. § 815(a)(1), provides in pertinent part:

## REVIEW BY THE SECRETARY

Sec. 105. (a)(1) An operator issued an order pursuant to the provisions of section 104 of this title, or any representative of miners in any mine affected by such order or by any modification or termination of such order, may apply to the Secretary for review of the order, may apply to the Secretary for review of the order within thirty days of receipt thereof or within thirty days of its modification or termination.

\* \* \* \* \* \*

Upon receipt of such application, the Secretary shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing, at the request of the operator or the representative of miners in such mine, *to enable the operator* and the representative of miners in such mine *to present information relating to the issuance and continuance of such order* or the modification or termination thereof or to the time fixed in such notice. The filing of an application for review under this subsection shall not operate as a stay of any order or notice. [Emphasis added.]

In implementation of the foregoing, the Secretary promulgated 43 C.F.R. § 4.587, which reads in pertinent part:

In proceedings brought under the Act, the applicant, petitioner or other party initiating the proceedings shall have the burden of proving his case by a preponderance of the evidence.

. . .

Old Ben strongly contends that the above-quoted regulation violates the Administrative Procedure Act (5 U.S.C. § 501 *et seq.*) in that:

(1) Section 105(a)(2) of the Act, 30 U.S.C. § 815(a)(2), requires that the public hearing which a coal mine operator may request under Section 105(a)(1), 30 U.S.C. § 815(a)(1), shall be subject to section 554 of title 5 of the United States Code, which in turn requires that the hearing shall be in accordance with section 556 of title 5.

(2) Section 556(d) of title 5 provides in pertinent part as follows:

(d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. . . .

(3) There is no provision in the Federal Coal Mine Health and Safety Act which requires the mine operator to carry the burden of proof in a review of summary agency action.

Respondents on the other hand argue that the legislative history of the Act and the specific language of Section 105(a)(1) of the Act (30 U.S.C. § 815(a)(1)) authorize the Secretary to require that the petitioner bear the burden of proof.

As we pointed out in the *Legislative History* section of this opinion, the primary concern of Congress in enacting the Act was the health and safety of the miner. We believe that it was the intent of Congress that coal mine operators would not carry on mining operations in the face of imminent danger. Both the legislative history of the Act and the specific language of Section 2(e) of the Act furnish ample evidence of the expectation of Congress that coal mine operators, *on their own initiative,* would cease routine operations in the face of imminent danger.

In delivering the Conference Report on S.2917 (Federal Coal Mine Health and Safety Act) to the Senate, Senator Harrison A. Williams, Jr., Chairman of the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, and a principal sponsor of S.2917, made the following statement:

. . . It should be *emphasized* at this point that the *operator* has a duty under the Act to withdraw persons from a mine or area thereof affected by an imminent danger *without wait-*

*ing for an inspector to order it.* [Emphasis added.] [5]

In line with this statement, the Congress in Section 2(e) of the Act placed the primary responsibility for mine safety upon the mine operators. Section 2(e) (30 U.S.C. § 801(e)) reads in pertinent part as follows:

(e) The operators of such mines . . have the primary responsibility to prevent the existence of such [unsafe and unhealthful] conditions and practices in such mines;

Respondents argue that Section 556(d) of title 5 specifically exempts from its provisions a statute which assigns the burden of proof on parties within its jurisdiction, and that Section 105(a)(1) of the Act, 30 U.S.C. § 815(a)(1), fits within that exemption because it specifically places on the operator who requests a public hearing the burden "to present information relating to the issuance and continuance of such order [Section 104(a) withdrawal order]". We think that an examination of the statutory scheme as a whole, as well as a review of the legislative history of the Act as discussed above, supports respondents' argument that the Secretary's regulation is consistent with the intent of Congress to place upon the mine operator the primary responsibility for the safety of the miners. As respondents logically say, it is, after all, his mine and he had the best knowledge of its condition. This is a consideration which has often been advanced as a special test for solving a limited class of cases, i. e., the burden of proving a fact is on the party who presumably has peculiar means of knowledge enabling him to prove its falsity, if it is false. 9 Wigmore, Evidence § 2486 (3d ed.). Thus, as Circuit Judge Murrah has said, the incidence of the burden of proof is primarily a matter of policy based on experience. *Denning Warehouse Co. v. Widener,* 172 F.2d 910, 913 (10th Cir. 1949).

Finally, we recognize the venerable principle that, when faced with a problem of statutory construction, courts give great deference to the interpretation of the administrator who is charged with the administration or enforcement of the statute. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), *reh. denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283. Here the interpretation of the Secretary, who under Section 30 U.S.C. § 957 is authorized to issue such regulations as he deems appropriate to carry out any provision of the Act, is clearly set forth in 43 C.F.R. § 4.587. Although we recognize that an administrative interpretation is not controlling, nonetheless the Secretary's interpretation is entitled to great weight and should be followed unless there are compelling indications that it is wrong. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). For the reasons set forth above, we find no compelling indications that the Secretary was wrong in interpreting the Act to place the burden of proof on the petitioner.

In any event, even if we assume *arguendo* that the Secretary did err in assigning the burden of proof to the petitioner, such error would not have made any real difference in the outcome of these three cases, for the evidence is such that if the burden of proof had been imposed upon the MESA, it would have been able to satisfy the burden of proving, by a preponderance of the evidence, the existence of an imminent danger.

When Congress acted to vest inspectors with power to order a coal mine owner immediately to withdraw employees from a mine when the inspectors find imminent danger of a disaster existing, Congress was fully informed that the coal mine owner would suffer economic loss as a result of correcting the dangerous conditions before permitting the employees to return to work. Con-

---

**5.** Legislative History, Federal Coal Mine Health and Safety Act (March 1970) at 1119, published by the House Committee on Education and Labor.

gress also well knew that gas and fire do not wait to cause explosions while notices are served and hearings are held. Congress meant for inspectors to have the authority it gave to them. It did not intend, when a fire alarm is sounded, that the authority to answer that alarm be withheld pending resolution of the assertion of a constitutional claim for notice and a full dress hearing. The costs to coal mine owners in dollars is inconsequential compared to the risk of the loss of lives of the coal miners.

For all of the foregoing reasons, the decision of the Board of Appeals in each of these three consolidated cases is Affirmed.

PELL, *Circuit Judge,* (dissenting).

With all due respect to an otherwise well-reasoned opinion, it appears to me that the majority opinion has misconceived, and has reached a lamentably incorrect result with regard to, the issue raised as to the burden of proof in proceedings to review the action of an inspector in shutting down a mine.

I do not quarrel with most of the pronouncements of the majority opinion in the portion dealing with the burden of proof. The gist of these pronouncements is that the primary responsibility for the safety of the miners is placed upon the mine operator. As the author of the opinion in *Freeman Coal Mining Co. v. Interior Bd. of Mine Op. App.,* 504 F.2d 741 (7th Cir. 1974), I indicated complete support for the proposition. We are not talking, however, about the power of the inspector to shut down a mine when in his discretion he has determined there is imminent danger. What we are, or should be, talking about is when the mine operator disagrees and takes the matter to a hearing does he or does the Government have the burden of proving that there was or was not an abuse of discretion.

None of us on this panel, and indeed I think this also applies to the mine operators, are saying that the inspector, be-

fore he can close the mine, must have a hearing or satisfy anyone other than himself that continued operation constitutes an imminent danger. In simple terms, the majority opinion states that when the Government inspector is satisfied that the circumstances justify his stopping an operating business completely, there is no burden on the Government after the business is stopped to prove that he was right.

The stopping of the business achieves the desired result of protection against what has been determined by only one person to be imminent danger. It is truly an awesome power when accompanied by a post-closing backup situation by virtue of which there is no necessity on the Government to prove the action correct. Instead, the company whose business has been stopped must prove that the discretionary judgment exercised by the single individual was wrong.

The problem of burden of proof was not before this court in *Freeman,* but we did note that the withdrawal order, if not set aside, may give rise to other penalties against the mine operator. 504 F.2d at 743. These, of course, are pursued at leisure[1] and not in the context of an on-the-spot inspection where the determination by its very dependence upon a status of imminence must be made expeditiously if at all.

Under the withdrawal order, the operation of the mine is stopped until corrective measures are applied to the claimed hazardous conditions. Unless the mine operator desires to discontinue its business permanently, it must perforce make the corrections irrespective of whether it believes, or indeed whether in fact, there is a situation of imminent hazard. All of this should not prevent the operator from clearing its name in subsequent hearing procedures which are provided for in the Act in question.

It appears to me that the only fair and proper requirement when the controversy goes to the post-fact hearing is that

1. In these three cases, the average delay between the issuance of the peremptory closure order and the review hearing was nearly one year.

the Government, which has initiated the action through the withdrawal order should be prepared to show that there was a basis for the action taken, that it was not predicated upon an insubstantial basis and was not arbitrary or capricious individual action. At the very least, the duty should rest upon the Government to establish a prima facie case to support its position. 2 K. Davis, Administrative Law Treatise, § 14.14 at 326–27 (1959).

I venture to say that almost every trial lawyer gives substantial consideration in marshalling his evidence to whether the burden of proof on the issue to which the evidence pertains is on him or his opponent. He is confronted with the question of whether he must himself prove support for his position affirmatively or whether the form of his proof will be in the first instance to negative the evidence produced by his opponent. This is true even though on ultimate analysis the case will be decided upon all of the evidence introduced. He cannot be unmindful if the opponent has the burden of proof that the evidence must be something more than a basis for the trier of fact to speculate or conjecture, *Shapleigh v. United Farms Co.,* 100 F.2d 287, 289 (5th Cir. 1938), and that upon a failure in this respect, judgment must go against the party upon whom the burden of proof rests. *Cross v. Simmons,* 96 F.2d 482, 486 (8th Cir. 1938).

The majority opinion, citing Wigmore, justifies placing the burden of proof on the mine operator since it had peculiar means of knowledge. However, we are not dealing with the general condition of the operator's mine but rather the condition at the particular place and at the particular time the order was issued. Since the inspector's judgment was at issue in the proceedings, it would appear that the facts were more particularly within his knowledge as to the necessity for a withdrawal order. Further, in the Wigmore text on the same page on which the majority opinion places reliance, the author states:

"The truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in the different situations." Wigmore, *supra,* at 275.

As I have already indicated, it appears to me eminently fair that once the supposed emergency situation has passed, unless the operator acquiesces in the propriety of the closing, the Government should be prepared to go forward with proof to justify the extraordinary action which is tantamount to the seizure of private property. This court is no stranger to an analogous situation in the labor law area where the Government agency is charging an employer with an unfair labor practice and in which the burden of proof is upon the General Counsel. .

In the present case, it is unnecessary to balance what appears to be fair against a contrary statutory requirement. Irrespective of what regulations as to burden of proof may have been adopted, the statute quite clearly places the burden of proof on the proponent of the order. In this case, the order is that of withdrawal of which the Government is the proponent. 30 U.S.C. § 815(a) provides that administrative review of withdrawal orders shall be subject to that section of the Administrative Procedure Act which provides for hearings, i. e., 5 U.S.C. § 554.

Section 554 requires that the actual hearings shall be conducted pursuant to 5 U.S.C. § 556. That section proves that "[e]xcept as otherwise provided by statute the proponent of a rule or order has the burden of proof." There is no provision of the Federal Coal Mine Health and Safety Act which requires the mine operator to carry the burden of proof in a review of summary agency action.

Whether the result would have been the same if the Government had proceeded on the basis that it had the burden of proof at the hearing is a matter of conjecture. The operator points out numerous deficiencies of proof. We should decline to speculate that the Government sustained its case. Because of the substantiality of the incorrectness

of the procedure adopted before the Board, it appears to me that the case requires a vacation of the order with a remand for further appropriate proceedings in which the burden of proof should rest upon the Government.

## ON PETITION FOR REHEARING

PERRY, Senior District Judge.

On June 30, 1975 Old Ben filed in this court a petition for rehearing and suggestion of rehearing *en banc,* to which, on July 24, 1975, respondents filed an answer. In its petition, Old Ben repeats its argument that 43 C.F.R. § 4.587 is directly contrary to section 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d), and that the majority of this panel incorrectly held that the Secretary did not err in assigning the burden of proof to Old Ben. In their answer to the petition for rehearing, respondents point out that Judge Pell, in his dissent from the majority opinion, stated:

. . . At the very least, the duty should rest upon the Government to establish a prima facie case to support is position. 2 K. Davis, Administrative Law Treatise, § 14.14 at 326–27 (1959).

Respondents contend that this duty has in fact been consistently imposed upon MESA by the Board. In support of their contention, respondents cite the very-recently-decided case of *Zeigler Coal Company,* 4 IBMA, 88,101, 3 Emp.S. H.Guide (CCH), ¶ 19,478 at 23,247 (March 31, 1975), where the Board held that the Government is required to bear the initial burden of presenting a *prima facie* case in the administrative hearings, although the mine owner bears the ultimate burden of proof under 43 C.F.R.

§ 4.587.[1] Respondents contend that in each of the three instant cases the Board thoroughly reviewed the evidence and was not of the opinion that the evidence was left "in equipoise" (to use the words of *Zeigler* ) as to its weight; that in case No. 74–1654 the Board approved the ALJ's finding that MESA had established by a preponderance of the evidence that the conditions and practices cited in the Order existed at the time of the issuance of the Order; and that similar findings were made in the other two cases (74–1655 and 74–1656).

 What we said in the section of our slip opinion entitled "Burden of Proof" applies *not* to the initial burden of going forward, but to the ultimate burden of persuasion. We certainly agree with Judge Pell that the Government should have—and we conclude that it does have—the duty to establish a *prima facie* case to justify the extraordinary action of closing down mining operations through the issuance of imminent danger orders. The Board so held in *Zeigler, supra,* and we concur in that holding. The *Zeigler* Board, however, went on to hold that the mine owner bears the ultimate burden of proof, and with this holding, too, we concur. In practice, therefore, the burden of proof is split, with the Government bearing the burden of going forward, and the mine operator bearing the ultimate burden of persuasion. We think that this accords with the intent of Congress as expressed in the following Committee comment on section 7(c) of the Administrative Procedure Act (now codified as 5 U.S.C. § 556(d)):

That the proponent of a rule or order has the burden of proof means not

---

1. In Zeigler Coal Company, *supra,* the Board used the following language:

 . . . We believe that although that regulation [43 C.F.R. § 4.587] places the *ultimate* burden of proof on the operator in ?. review proceeding involving an imminent danger withdrawal order, such regulation nonetheless does not relieve MESA from the statutory obligation of making out a *prima facie* case in the first place. If, after MESA establishes a *prima facie* case, the operator fails

to overcome MESA's case by a preponderance of the evidence with respect to each element of proof in dispute, then, MESA prevails and the operator's request for relief must be denied. The same result would apply, by virtue of 43 CFR 4.587, if the trier of fact should determine that the evidence is equally favorable to both parties—or in equipoise—as to each of the elements of proof in dispute. [Footnote omitted.]

only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain. Sen.Doc.No.248, 79th Cong., 2d Sess., 208, 270 (1946).

Although 43 C.F.R. § 4.587 might have been more artfully drafted, we read it to mean simply that the petitioner who initiates the proceedings— here Old Ben—has the ultimate burden of persuasion. We do not think that the regulation was intended to relieve—nor, indeed, can it relieve—the proponent of an imminent danger order from the burden of putting forth a *prima facie* case in the administrative hearings.

We conclude therefore that once the emergency passed, the Government did go forward with proof to justify the extraordinary action of the inspectors in issuing the imminent danger orders in each of the three instant cases. We are persuaded that the Government presented a *prima facie* case in the administrative hearings in each of the three instant cases; that Old Ben was given ample opportunity, but failed, to rebut the *prima facie* cases; and that Old Ben thereby failed to sustain its ultimate burden of persuasion.

In sum, we think that once the *proponent of an order has presented a prima facie* case, it has discharged its burden of proof. See, e. g., *National Airlines, Inc. v. Civil Aeronautics Board,* 112 U.S.App.D.C. 119, 300 F.2d 711, 715 n. 12 (1962).

Old Ben points out numerous deficiencies of proof. But our function is not to resolve conflicts in the evidence; rather, it is to determine if there was sufficient evidence to support the findings of imminent danger. And, as we have already held, there was substantial evidence to support the Board's findings of imminent danger.

The petition for rehearing is Denied. A majority of the judges in active service who voted on the matter having voted to deny the suggestion of *en banc* rehearing, the suggestion that the matter.be reheard *en banc* is Denied.

PELL, Circuit Judge (dissenting).

The cases which were before this court were petitions for review of three decisions of the Interior Board of Mine Operations Appeals to whom authority had been delegated by the Secretary of the Interior.

When the consolidated petitions were originally considered by the three-judge panel of this court, the Government clearly and unequivocally took the position that the burden of proof, without qualification, in the administrative hearings subsequent to the summary closures by the inspectors was on the mine operator not upon the Government.

Thus, beginning at page 27 of the Government's brief the issue is stated, "The Secretary Properly Assigned the Burden of Proof to the Petitioner During the Administrative Proceedings Pursuant to Section 105(a)(1)."

The brief justified placing the burden of proof on the mine operator by stating: "It is, after all, his mine and the condition of it is best in his knowledge." (Page 30) "To place the burden on the Secretary would seriously frustrate the Act. Accordingly, the Board's assignment of the burden of proof pursuant to Section 105(a)(1) of the Act is entirely consistent with this Congressional intent." (page 31)

In its response to the petition for rehearing, seizing upon my observation in my dissenting opinion that, at the very least, the duty should rest upon the Government to establish a prima facie case to support its position, the Government asserts that this "is the duty which the Board in the past has consistently placed on MESA and the duty it will continue to place on MESA in the future," citing the case of *Zeigler Coal Company,* 4 IBMA, 88,101, 3 Emp.S.H. Guide (CCH), ¶ 19,478 at 23,247 (1975). Other than this bald assertion there is no support in the record that this policy was pursued in the three proceedings here

under review. These three cases were decided in July 1974 based on ALJ hearings in 1973. *Zeigler* was decided in March 1975. While the Government's response to the petition to rehearing would suggest that it had assumed the burden of prima facie proof consistently in the past, the Board in its decision in *Zeigler,* "because of the apparent confusion over the application of the burden of proof rule," deemed it necessary to clarify the Board's position on the burden of proof issue. There is conspicuously absent from the decision any reference to the procedure announced in *Zeigler* as having been the theretofore accepted procedure.

The petitioner here if denied due process in its hearing by having the burden not only of ultimate proof but prima facie as well can find little solace in a subsequently announced change of procedure.

While it is not clear what approach was utilized by the ALJ in one of the three cases insofar as prima facie proof is concerned, there is no question that the prima facie burden of proof was placed on the operator in the other two. In Appeal No. 74–1654, the company put on its testimony at the beginning of the ALJ hearing. At the conclusion of the testimony, "the Applicant rested his case, and counsel for the United Mine Workers moved for dismissal of the case on the ground that Applicant failed to carry his burden of proof." One cannot resist commenting that it is indeed unorthodox for the party having the prima facie burden to put on its evidence after the party not having that burden has proceeded to do so. In any event, the Union motion was taken under advisement and the Government then called its witnesses. At the conclusion of his discussion of the evidence, the ALJ observed that "[i]n a review proceeding concerning a 104(a) imminent danger order, the burden of proof lies with the Applicant." In his Conclusions of Law this phrase was repeated followed by the conclusion that the "Applicant in this proceeding has not met his burden of establishing that the condition or practice recited in the subject order did not constitute imminent danger."

In appeal No. 74–1656, the operator again had to put its testimony on first, including in this instance calling the inspector as an adverse witness. In this case, it was MESA which at the conclusion of the operator's presentment moved for summary dismissal of the application. This was taken under advisement. The Government proffered no witnesses but put into evidence the testimony of an expert who had testified in a previous case.

I have addressed myself to the position *now* taken by the Government which position I cannot find supports the decisions in the cases before us. For this reason alone, it is my opinion that the petition for rehearing should have been granted and the cases remanded for proper due process proceedings. Even of greater significance, however, in my opinion, is the fact that the Government still adamantly insists that the ultimate burden of proof in the post-summary-closing administrative hearings should be on the one whose mine has been closed. This attitude basically is: "We took your property without notice or hearing and if you think we were wrong, prove it." This in my opinion is not good government and is violative of what is still regarded as a basic Constitutional precept.

For the reasons expressed in my dissenting opinion on the matter of where the ultimate burden of proof should rest, I dissent from the denial of rehearing.[1] The cases should be remanded for further proper and appropriate proceedings. The end result may well be the same. Irrespective of what the end result may be in these particular cases, the more significant aspect is the establishment of fairness of procedure which, as Mr. Justice Frankfurter observed, is due process in the primary sense. *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S.

---

1. I also voted to rehear these cases *en banc* as did Judges Swygert and Stevens.

123, 161, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

That this matter is not just an inconsequential "tempest" is graphically demonstrated by the quotation from *Zeigler* that if the trier of fact should determine that the evidence is equally balanced, "or in equipoise," the operator's request for relief must be denied because it has failed to sustain its burden of proof that a Government agent has improperly closed its mine, a subjective determination made without hearing or notice. I find it shocking that the Government should not ultimately have to prove justification by a fair preponderance of the evidence.