ENVIRONMENTAL DEFENSE FUND,
INC., Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY and Russell E. Train,
Administrator, Respondents,

Velsicol Chemical Corporation and
Pineapple Growers Association of
Hawaii et al., Intervenors.

Earl L. BUTZ, Secretary of Agriculture
of the United States, Petitioner,

v.

Russell E. TRAIN, Administrator of the
Environmental Protection Agency,
Respondent,

Velsicol Chemical Corporation, Intervenor.

VELSICOL CHEMICAL CORPORATION,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Russell E. Train,
Administrator, Respondent.

VELSICOL CHEMICAL CORPORATION,
Petitioner,

v.

Russell E. TRAIN, Administrator,
Environmental Protection
Agency, Respondent.

Nos. 75–2259, 76–1181, 76–1245
and 76–1247.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 15, 1976.

Decided Nov. 10, 1976.

As Modified and Supplemental Opinion on
Denial of Rehearing Jan. 6, 1977.

Jacqueline M. Warren, Washington, D.C., with whom William A. Butler and John F. Dienelt, Washington, D.C., were on the brief for petitioner in No. 75–2259.

Raymond W. Fullerton, Atty., with whom James Michael Kelly, Asst. Gen. Counsel, Alfred R. Nolting and Margaret M. Brienholt, Attys., Dept. of Agriculture, Washington, D.C., were on the brief for petitioners in No. 76–1181.

Robert L. Weinberg, Washington, D.C., with whom John G. Kester, Richard M. Cooper and Kendrae Heymann, Washington, D.C., were on the brief for intervenor Veliscol Chemical Corp.

Michael H. Stein, Atty., Dept. of Justice, Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen., Robert E. Kopp, Atty., Dept. of Justice Robert V. Zener, Gen. Counsel, E.P.A., Richard J. Denney Jr., Associate Gen. Counsel, John E. Bonine, Deputy Associate Gen. Counsel, Lee C. Schroer and Ronald C. Hausmann, Attys., E.P.A., Washington, D.C., were on the brief for respondents.

Peter Barton Hutt and Clausen Ely, Jr., Washington, D.C., were on the brief for intervenor, Pineapple Growers Association of Hawaii, and others.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

This case involves the pesticides heptachlor and chlordane. Consolidated petitions seek review of an order of the Environmental Protection Agency (EPA) suspending the registration of those pesticides under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)[1] for certain uses. The Administrator of EPA issued an order on December 24, 1975. The order prohibited further production of these pesticides for the suspended uses, but permitted the pesticides' continued production and sale for limited minor uses. Even as to the suspended uses, the Order tempered its impact in certain respects: It delayed until August 1, 1976, the effective date of the prohibition of production for use on corn pests; and it permitted the continued sale and use of existing stocks of registered products formulated prior to July 29, 1975.

■ One petition to review was filed by Earl L. Butz, Secretary of Agriculture of the United States (U.S.D.A.). Secretary Butz and intervenor Velsicol Chemical Corporation, the sole manufacturer of heptachlor and chlordane, urge that the EPA order as to chlordane be set aside on both substantive and procedural grounds.[2] They contend that substantial evidence does not support the Administrator's conclusion that continued use of chlordane poses an "imminent hazard"[3] to human health, and that the Administrator made critical errors in assessing the burden of proof and in weighing the benefits against the risks of continued use of chlordane.

The other petition, filed by Environmental Defense Fund, urges that the Order did not go far enough to protect against the hazards of heptachlor and chlordane use. EDF sought an injunction against the provisions permitting continued production and use of the pesticides on corn pests until August 1, 1976. EDF also challenges the Administrator's decision to allow continued use of the stocks of the two pesticides existing as of July 29, 1975,[4] contending that EPA should have provided for retrieval and controlled disposal of such stocks. EDF also contends that the Administrator erred in failing to suspend certain "minor uses" of chlordane and heptachlor.[5]

On the issue of retrieval of existing stocks, we remand for further consideration. In all other respects, we affirm the Administrator's Order. In view of our conclusion, we denied EDF's request for a stay pending appeal of the provision delaying the effective date for use on corn pests.[6] In effect, we approved the delay of effective date (as to corn) until August 1, 1976, and in this opinion we set forth our reasons for that conclusion. (Part II, B, 1)

## I. STATUTORY FRAMEWORK AND STANDARD OF REVIEW

The issues posed by administrative action pursuant to FIFRA are not new to this

---

1. 7 U.S.C. § 136 et seq. (Supp. V. 1975).

2. Velsicol has voluntarily ceased production of heptachlor for the uses suspended by the Administrator, and has not really attacked the Administrator's decision suspending those uses. USDA urges that this makes the heptachlor issues moot. Although we put more emphasis on chlordane than heptachlor in this opinion, we cannot agree with USDA that voluntary cessation of production moots our consideration of the order of suspension as to heptachlor, since this voluntary acquiescence does not bind Velsicol; nor does it resolve the challenges EDF makes to EPA's failure to recall heptachlor stocks from the distributive chain and its refusal to suspend heptachlor's use on pineapples and for seed treatment.

3. 7 U.S.C. § 136d(c)(1) (Supp. V 1975).

4. July 29, 1975, was the day the Notice of Intent to Suspend was issued.

5. The Pineapple Growers Association of Hawaii and the Attorney General and Department of Agriculture of the State of Hawaii also intervened to defend the decision to continue registration of one of the minor uses—control of ants on pineapples.

6. On February 13, 1976, EDF argued for a stay of the Administrator's Order permitting continued use of chlordane and heptachlor on corn until August 1, 1976; on February 17, 1976, this court deferred ruling on that motion until oral arguments on the merits. The motion for stay was denied April 16, 1976.

court,[7] and we have previously extensively described the statutory framework for such actions. What is involved here is a suspension of registration of two pesticides during the pendency of the more elaborate cancellation of registration proceeding, initiated in this case by a November 18, 1974, notice of intent to cancel. This 1974 notice stated that there existed "substantial questions of safety amounting to an unreasonable risk to man and the environment" from continued use of heptachlor and chlordane. Public cancellation hearings pursuant to that notice were not expected to commence for some time.[8] On July 29, 1975, the Administrator issued a Notice of Intent to Suspend the registrations of most uses of the two pesticides. The Administrator then commented on that expected delay in completing the cancellation hearings, and cited "new evidence . . . which confirms and heightens the human cancer hazard posed by these pesticides." On August 4, 1975, registrant Velsicol Chemical Corporation requested an expedited adversary hearing on the suspension question pursuant to § 6 of FIFRA, 7 U.S.C. § 136d(c). Administrative Law Judge Herbert L. Perlman presided over the cancellation hearings beginning August 12. Evidence was limited to human health issues and the benefits of continued use of heptachlor and chlordane. The record was closed December 4, 1975, and on December 12, the ALJ recommended against suspension, stating that he was unable to find that "heptachlor and chlordane are conclusively carcinogens in laboratory animals."[9] The Administrator reversed that decision on December 24, 1975, and suspended most uses of chlordane and heptachlor.

The Administrator is authorized to suspend the registration of a pesticide where he determines that an "imminent hazard" is posed by continued use during the time required for cancellation. Section 6(c) of FIFRA, 7 U.S.C. § 136d(c)(1). An "imminent hazard" exists where continued use during the time required for the cancellation proceeding would be likely to result in "unreasonable adverse effects on the environment." Section 2(l) of FIFRA, 7 U.S.C. § 136(l). The term "unreasonable adverse effects on the environment" is, in turn, defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." Section 2(bb) of FIFRA, 7 U.S.C. § 136(bb).

As in our previous suspension case involving aldrin/dieldrin,[10] the primary challenge raised by Velsicol and USDA goes to the adequacy of the evidentiary basis of EPA's finding that the suspended pesticides present an imminent hazard during the time required for cancellation. The standard against which we test that challenge is defined in Section 16(b) of FIFRA:

> The court shall consider all evidence of record. The order of the Administrator shall be sustained if it is supported by substantial evidence when considered on the record as a whole.

The standard of substantial evidence has been defined as:[11]

> something less than the weight of the evidence . . . [T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

7. *See EDF v. EPA [Shell Chemical Co., et al.]*, 167 U.S.App.D.C. 71, 510 F.2d 1292 (1975); *EDF v. EPA*, 160 U.S.App.D.C. 123, 489 F.2d 1247 (1973); *EDF v. EPA*, 150 U.S.App.D.C. 348, 465 F.2d 528 (1972); *EDF v. Ruckelshaus*, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971); *Wellford v. Ruckelshaus*, 142 U.S.App.D.C. 88, 439 F.2d 598 (1971).

8. At the time the briefs in this case were filed, the hearings had still not begun in the cancellation proceeding.

9. ALJ Recommended Decision at 86.

10. *EDF v. EPA [Shell Chemical Co., et al.]*, 167 U.S.App.D.C. 71, 510 F.2d 1292 (1975).

11. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

In applying this principle of review [12] in the specific context of a suspension of pesticides, this court has reiterated that "the function of the suspension decision is to make a preliminary assessment of evidence, and probabilities, not an ultimate resolution of difficult issues. We cannot accept the proposition . . . that the Administrator's findings . . . [are] insufficient because controverted by respectable scientific authority. It [is] enough at this stage that the administrative record contain[s] respectable scientific authority supporting the Administrator." *Environmental Defense Fund v. EPA [Shell Chemical Co., et al.]*, 167 U.S.App.D.C. 71, 77, 510 F.2d 1292, 1298 (1975) *quoting Environmental Defense Fund v. EPA*, 150 U.S.App.D.C. 348, 357, 465 F.2d 528, 537 (1972).

■ These decisions of our court also point out that the Administrator is not required to establish that the product is unsafe in order to suspend registration, since FIFRA places "[t]he burden of establishing the safety of a product requisite for compliance with the labeling requirements . . at all times on the applicant and registrant." [13] Velsicol and USDA urge that this allocation of burden of proof relied on by the Administrator is inconsistent with the explicit terms of FIFRA. They rely on FIFRA's specific incorporation of subchapter II of the Administrative Procedure Act, which provides in relevant part that "Except as otherwise provided by statute, the proponent of a rule or order shall have the burden of proof." 5 U.S.C. § 556(d).

The EPA regulation governing the burden of proof in suspension proceedings provides:

At the hearing, the proponent of suspension shall have the burden of going forward to present an affirmative case for the suspension. However, the ultimate burden of persuasion shall rest with the proponent of the registration. 40 C.F.R. § 164.121(g) (1975).

Assuming that the Administrator is the "proponent" of a suspension order and is governed by § 556(d), the legislative history of that provision indicates that it allocates the burden of going forward rather than the burden of ultimate persuasion and is consistent with the EPA's apportionment of burden:

That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain. S.Doc.No.248, 79th Cong., 2d Sess. 208, 270 (1946).

This allocation of the burden of going forward [14] structures evaluation of the factual evidence adduced for both the Administrator and the reviewing court, and is consistent with the traditional approach that this burden normally falls on the party having knowledge of the facts involved.

■ In urging that the ultimate burden of proof in a suspension proceeding rests on the Administrator, Velsicol and

---

12. The problem of applying the substantial evidence standard to decisions made at the frontiers of scientific knowledge was commented on in *Industrial Union v. Hodgson*, 162 U.S. App.D.C. 331, 499 F.2d 467 (1974). *See generally* Note, *Judicial Review of the Facts in Informal Rulemaking*, 84 Yale L.J. 1750, 1760–68 (1975). Similar problems are presented in review under the arbitrary and capricious standard. *See, e. g., Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 501 F.2d 722 (1974).

13. *EDF v. EPA*, 167 U.S.App.D.C. at 76, 510 F.2d at 1297, *quoting EDF v. EPA*, 150 U.S. App.D.C. at 352, 465 F.2d at 532.

14. *See also NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 176 (2d Cir. 1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). In *Stearns Electric Paste Co. v. EPA*, 461 F.2d 293, 305 (7th Cir. 1972), Judge Stevens held that the 1964 amendments to FIFRA had shifted the burden of proof to the registrant "whether in a proceeding for initial registration or in a cancellation proceeding." In view of our decision that the EPA's allocation of burden of proof is consistent with the requirements of § 556(d), the 1972 general incorporation of APA standards into FIFRA did not operate to shift the ultimate burden of proof away from the registrant *sub silentio*.

USDA assert that the suspension decision is a drastic step differing fundamentally from both the registration and cancellation decisions made under FIFRA. But we have already cautioned that the "imminent hazard" requisite for suspension is not limited to a concept of crisis: "It is enough if there is *substantial likelihood* that serious harm will be experienced during the year or two required in any realistic projection of the administrative process." [15] "FIFRA confers broad discretion" on the Administrator to find facts and "to set policy in the public interest." *Wellford v. Ruckelshaus,* 142 U.S.App.D.C. 88, 91, 439 F.2d 598, 601 (1971). This broad discretion was conferred on the implicit assumption that interim action may be necessary to protect against the risk of harm to the environment and public health while a fuller factual record is developed in the cancellation proceeding. This avenue of protective relief would be effectively foreclosed if we accepted Velsicol's argument that the Administrator must *prove* imminent hazard [16]—apparently in some sense of weight of the evidence, going beyond substantial likelihood. But as we have already pointed out, the basic statutory directive requires affirmance of the Administrator's decision if supported by substantial evidence, and this requires "something less than the weight of the evidence." [17] We reject that renewed invitation to exercise increased substantive control over the agency decision process, and turn to a consideration of whether the Administrator's decision to suspend most uses of heptachlor and chlordane is supported by substantial evidence.

## II. SUBSTANTIAL EVIDENCE SUPPORT FOR THE ADMINISTRATOR'S DECISION

To evaluate whether use of a pesticide poses an "unreasonable risk to man or the environment," the Administrator engages in a cost-benefit analysis that takes "into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). We have previously recognized that in the "preliminary assessment of probabilities" involved in a suspension proceeding, "it is not necessary to have evidence on . . . a specific use or area in order to be able to conclude on the basis of substantial evidence that the use of [a pesticide] in general is hazardous." *EDF v. EPA,* 160 U.S. App.D.C. at 130, 489 F.2d at 1254, *quoted in EDF v. EPA [Shell Chemical Co.],* 167 U.S. App.D.C. at 80, 510 F.2d at 1301. "Reliance on general data, consideration of laboratory experiments on animals, etc." has been held a sufficient basis for an order cancelling or suspending the registration of a pesticide. *Id.* Once risk is shown, the responsibility to demonstrate that the benefits outweigh the risks is upon the proponents of continued registration. Conversely, the statute places a "heavy burden" [18] of explanation on an Administrator who decides to permit the continued use of a chemical known to produce cancer in experimental animals. Applying these principles to the evidence adduced in this case, we conclude that the Administrator's decision to suspend most uses of heptachlor and chlordane and not to suspend others is supported by substantial evidence and is a rational exercise of his authority under FIFRA.

---

**15.** *EDF v. EPA,* 167 U.S.App.D.C. 71 at 76, 510 F.2d at 1297, quoting *EDF v. EPA,* 150 U.S. App.D.C. at 360, 465 F.2d at 540.

Our en banc decision in *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373 at 388, 541 F.2d 1 at 16, n. 28 (1976), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), considered this standard as more rigorous than the standard involved in *Ethyl*; we have not sought to engage in a comparative analysis of the differences that may be discernible in these two statutory standards, but have rested with applying the "substantial likelihood" standard to the facts of this case.

**16.** Velsicol Br. at 31.

**17.** See text at note 11.

**18.** 167 U.S.App.D.C. at 81, 510 F.2d at 1302, *quoting EDF v. Ruckelshaus,* 142 U.S.App.D.C. 74, 86 n. 41, 439 F.2d 584, 596 n. 41 (1971).

## A. Risk Analysis—Carcinogenicity of Heptachlor and Chlordane

Velsicol and USDA contend that the laboratory tests on mice and rats do not "conclusively" demonstrate that chlordane is carcinogenic to those animals; that mice are too prone to tumors to be used in carcinogenicity testing in any case; and that human exposure to chlordane is insufficient to create a cancer risk. They place strong reliance on the Administrative Law Judge's refusal to recommend suspension because he was "*hesitantly unwilling at this time* to find that heptachlor and chlordane are conclusively carcinogens in laboratory animals." Rec.Dec. at 86 (emphasis in original). The ALJ recognized however, that on the basis of the record made the Administrator "could determine that the pesticides involved pose potential or possible carcinogenic risk to man" and that he could "find that heptachlor and chlordane are conclusively carcinogenic in laboratory animals." [19] While adopting the ALJ's factual findings, the Administrator concluded that the ALJ had applied an erroneous legal standard in requiring a conclusive rather than probable showing that the pesticides were animal carcinogens, and concluded in any case that the evidence showed heptachlor and chlordane to be animal carcinogens. We affirm.

### 1. Mice and Rat Studies

■ An ultimate finding in a suspension proceeding that continued use of challenged pesticides poses a "substantial likelihood of serious harm" must be supported by substantial, but not conclusive, evidence. In evaluating laboratory animal studies on heptachlor and chlordane there was sufficient "respectable scientific authority" upon which the Administrator could rely in determining that heptachlor and chlordane were carcinogenic in laboratory animals.

■ We start by rejecting Velsicol's argument that the "cancer principles" EPA relied on in structuring its analysis of the mice and rat studies improperly biased the agency's open-minded consideration of the evidence.[20] In brief form, the principles accept the use of animal test data to evaluate human cancer risks; consider a positive oncogenic effect in test animals as sufficient to characterize a pesticide as posing a cancer risk to man; recognize that negative results may be explained by the limited number and sensitivity of the test animals as compared to the general human population; note that there is no scientific basis for establishing a no-effect level for carcinogens; and view the finding of benign and malignant tumors as equally significant in determining cancer hazard to man given the increasing evidence that many "benign" tumors can develop into cancers. The Agency's reliance on these principles did not come as a surprise to Velsicol; they were included in the Administrator's Notice of Intent to Suspend; and as recognized in *EDF v. EPA,* 167 U.S.App.D.C. at 77–78, 510 F.2d at 1298–99, form part of the Agency's "scientific expertise." Velsicol was properly given an opportunity to put in evidence contesting those principles, but failed to demonstrate anything more than some scientific disagreement with respect to them. Velsicol's principal complaint—that mice are inappropriate test animals—

19. ALJ Recommended Decision at 86–87, n. 25.

20. Velsicol also claims that ex parte contact between the enforcement staff and the Acting Administrator on this point requires reversal of the suspension order. After having been contacted by the enforcement staff, the Acting Administrator issued a clarification of the July 29 Notice to Suspend which made clear that Velsicol could challenge the cancer principles during the suspension hearing. These facts do not require reversal. We have indicated that the prosecuting staff may consult with the agency head concerning the initiation of a second related proceeding or, where emerging evidence requires it, the broadening of an existing charge. *Environmental Defense Fund, Inc. v. EPA,* 167 U.S.App.D.C. 71, 84, 510 F.2d 1292, 1305 (1975). The consultations here, which were intended to aid the agency head in his function of framing charges, were of the same procedural type. While we are sensitive to the danger of abuse in such consultations, there was clearly no unfairness in the circumstances of this case, since the effect of the resulting order was simply to recognize the registrant's right to present additional evidence.

was specifically rejected by the Administrator, citing statements by the National Academy of Sciences' Food Protection Committee, the World Health Organization, HEW's Commission on Pesticides and their Relationship Environmental Health, FDA Advisory Panel on Carcinogenesis, International Agency for Research on Cancer, and Director of the National Cancer Institute's Carcinogenesis Program.[21] Unlike the failure to adduce critical methodology that we criticized in *International Harvester*,[22] EPA's specific enunciation of its underlying analytic principles, derived from its experience in the area, yields meaningful notice and dialogue, enhances the administrative process and furthers reasoned agency decisionmaking.

■ The animal experiments the Administrator relied on tested heptachlor, its chief metabolite heptachlor epoxide and chlordane. Technical or commercial heptachlor and chlordane both contain the substances tested.[23] Five studies involved mice and one involved rats. Velsicol urges that only the chlordane studies can be relied on to support a finding of carcinogenicity for chlordane, and more broadly, that there was insufficient objective evidence of carcinogenicity in laboratory animals to find a cancer risk to man. The objective evidence Velsicol charges is lacking is evidence that the tumors induced during the feeding studies had properties of invasion (spreading of a tumor into adjacent tissues) and metastasis (spreading of malignant cells into non-adjacent tissues)—characteristics two of their witnesses considered essential definitional elements of "cancer." By contrast, the other pathologists consulted during the suspension proceeding generally believe that cancer can be reliably diagnosed by observation of tissue cells under a microscope (histopathological evidence) without evidence, or very much evidence, of invasion or metastasis. The Administrator concluded, on what we view as respectable scientific authority, that evidence of invasion and metastasis is not essential to the diagnosis of cancer in mice, and also found that metastasis and invasion had been reported in some of the studies where protocols for the study did not preclude such analysis. That a low percentage of metastasis was found in those studies was also explained by the failure to use the more sensitive examination techniques developed since the studies relied on here were carried out.

■ In reviewing and evaluating the studies relied on by the Administrator, five EPA witnesses and five Velsicol consultants agreed that animals fed chlordane and animals fed heptachlor/heptachlor epoxide in fact underwent cellular changes indicating malignancy. Dr. Reuber reevaluated the FDA C3H Mouse Study of 1965 and found "a statistically significant increase in carcinomas" in the mice treated with heptachlor/heptachlor epoxide. The ALJ concluded that no substantial refutation of his results was made.[24] The 1959 Kettering CFN Rat Study tested heptachlor epoxide; five pathologists found that the original evaluation had underdiagnosed liver cancer, the biological significance of which was found by Judge Perlman to be "especially significant because of the rarity of this finding."[25] Histological review of the IRDC CD–1 Mouse Study, using a hardy non-inbred strain of mice with low incidence of spontaneous tumors, resulted in the finding of "a highly statistically significant incidence of hepatocellular carcino-

**21.** See also EDF v. EPA, 167 U.S.App.D.C. 71, 78, 510 F.2d 1292, 1299 (1975); Synthetic Organic Chemical Manufacturers Association v. Brennan, 503 F.2d 1155, 1160 (3d Cir. 1974), cert. denied, 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1975).

**22.** 155 U.S.App.D.C. 411, 439, 478 F.2d 615, 643 (1973).

**23.** Technical chlordane was arbitrarily named, and actually is made up of 13–15% alpha-chlordane, 13–15% gammachlordane, and 5–8% heptachlor. ALJ Recommended Decision at 7.

**24.** ALJ Recommended Decision at 78, 82.

**25.** ALJ Recommended Decision at 82.

mas" for those mice fed heptachlor/heptachlor epoxide,[26] and basically the same finding for mice fed chlordane.[27] After considering design problems of control group and dosages, the Administrator also relied on the preliminary results of National Cancer Institute B6C3F1 Mouse Studies of Heptachlor and Chlordane, showing a highly statistically significant increase in carcinomas in a strain of mice with a low spontaneous incidence of tumors.[28] The Administrator has adequately explained his reliance on these test results which show significant carcinoma development in treated animals. None of the tests yielded negative results; chlordane was shown to be independently carcinogenic, as well as to contain a carcinogenic component (heptachlor/heptachlor epoxide). We think it plain that the foregoing establishes substantial evidence supporting the Administrator's result, and that Velsicol cannot be said to have met its burden of overcoming EPA's prima facie case by showing that chlordane and heptachlor are not carcinogenic in laboratory animals.

### 2. *Extrapolation of Animal Data to Man*

Human epidemiology studies so far attempted on chlordane and heptachlor gave no basis for concluding that the two pesticides are safe with respect to the issue of cancer.[29] To conclude that they pose a carcinogenic risk to humans on the basis of such a finding of risk to laboratory animals, the Administrator must show a causal connection between the uses of the pesticides challenged and resultant exposure of humans to those pesticides. He made that link by showing that widespread residues of heptachlor and chlordane are present in the human diet and in human tissues. Their widespread occurrence in the environment[30] and accumulation in the food chain[31] is explained by their chemical properties of persistence, mobility and high solubility in lipids (the fats contained in all organic substances). Residues of chlordane and heptachlor remain in soils and in air and acquatic ecosystems for long periods of time.[32] They are readily transported by means of vaporization, aerial drift, and runoff of eroding soil particles.[33] The residues have been consistently found in meat, fish, poultry and dairy products monitored in the FDA Market Basket Survey and are also frequent in components of animal feeds. This evidence supports a finding that a major route of human exposure is ingestion of contaminated foodstuffs.[34] EPA's National Human Monitoring Survey data shows that heptachlor epoxide and oxychlordane, the principal metabolites of heptachlor and chlordane respectively, are present in the adipose tissue of over 90% of the U.S. population.[35]

The population's exposure to these pesticides, in large part involuntary, can be divided into agricultural and nonagricultural related routes. Seven million pounds of

**26.** ALJ Recommended Decision at 80.

**27.** ALJ Recommended Decision at 80.

**28.** Administrator's Opinion at 23.

**29.** ALJ Recommended Decision at 86, n. 25; Administrator's Opinion at 18–19.

**30.** EPA Ex. 20 (Carey); EPA Ex. 24A–C (Seba); VCC Ex. 6, Tr. 3268 (Fink); VCC Ex. 7 (Feltz).

**31.** ALJ at 9–12, 18–19; EPA Exs. 16, 16I, 16L (Cummings); EPA Ex. 17 (Munsen); EPA Ex. 23 (Sanborn); VCC Ex. 5 (Macek).

**32.** USDA Exs. 5, 5A–5E (Nash); EPA Exs. 21 (Taylor); EPA 17 (Munsen); 23B (Sanborn); EPA Ex. 24 (Seba).

**33.** VCC Ex. 13A at 1628–1675; USDA Ex. 5F, Tr. 5978 (Nash); EPA Ex. 17 (Munsen); EPA Exs. 21, 21C–F (Taylor); EPA Ex. 24 (Seba); VCC Ex. 7 (Feltz), Tr. 4106–13 (Polen); 3292–94, 3310 (Feltz).

**34.** ALJ Recommended Decision at 18.

**35.** ALJ at 9–11; EPA Ex. 18 (Kutz). Between 1970 and 1974, heptachlor epoxide residues averaging .08–.09 ppm were found in 94.8%, 96.2%, 90.3%, 97.7% and 96.3% respectively of the human fat samples tested. Between 1971 and 1974, oxychlordane residues averaging .10–.12 ppm were found in 93.3%, 92.3%, 98.3% and 98.6% respectively, of the samples analyzed.

heptachlor and chlordane were used as corn soil insecticide in 1975, producing residues which persist in the soil for several years after application. These residues are taken up by such food, feed, and forage crops as soybeans, barley, oats, and hays typically rotated with corn.[36] By volatilization the pesticides contaminate corn and other plant leaves.[37] And root crops like potatoes, carrots and beets directly absorb the pesticides from the soil.[38] Other sources of agricultural-related residues include exposure to contaminated dust particles and agricultural runoff containing eroded soil particles.

Velsicol urges that the dietary exposure resulting from agricultural uses of the pesticides is insignificant, and that current exposure is well below "safe" dose levels as calculated by the Mantel-Bryan formula, or by the World Health Organization's Acceptable Daily Intake figures. Mantel himself criticized the use of the formula for a persistent pesticide, and the Administrator rejected the concept of a "safe" dose level defined by mathematical modeling because of "the incomplete assumptions made by the registrant's witnesses about the sources of human exposure in the environment, the natural variation in human susceptibility to cancer, the lack of any evidence relating the level of human susceptibility to cancer from heptachlor and chlordane as opposed to that of the mouse, and the absence of precise knowledge as to the minimum exposure to a carcinogen necessary to cause cancer."[39] That explanation is within the reasonable bounds of the agency's expertise in evaluating evidence. And it is confirmed by the common sense recognition that reliance on average "safe" dietary levels fail to protect people with dietary patterns based on high proportional consumption of residue-con-

taminated foods (*e.g.*, children who ingest greater quantities of milk than the general population).[40]

There are several non-agricultural uses which involve a large volume of heptachlor and chlordane as well as significant human exposures. For example, the record shows that approximately six million pounds of chlordane are used annually on home lawns and gardens. The Administrator found that these uses involve high risks of human intake "due to the many avenues which exist for direct exposure, through improper handling and misuse, inhalation, and absorption through the skin from direct contact."[41] Velsicol asserts that the mice studies showing carcinogenic effects after ingestion of chlordane do not warrant an inference about the carcinogenic effects of inhaling it or absorbing it through the skin, and that consequently nonagricultural routes of exposure cannot be considered to present a cancer risk. They rely on *Reserve Mining Co v. EPA*, 514 F.2d 492 (8th Cir. 1975) (en banc). That reliance is misplaced. In that case, the court was concerned with the propriety of the district court's granting the immediate relief of shutting down a plant discharging asbestos fibers into the City of Duluth's drinking water source. It instead ordered cessation of dumping within a "reasonable time" pursuant to the unstructured equitable discretion given the court under the Federal Water Pollution Control Act, even though it had concluded that continued discharge posed a hazard to health. By contrast, the FIFRA statutory scheme mandates explicit relief—the suspension of registration—when an unreasonable risk to health is made out. We have previously held that it is not necessary to have evidence on a specific use to be able to

36. EPA Exs. 21, 21B (Taylor); EPA Exs. 16C, 16E, 16G (Cummings); USDA Exs. 5, 5H, 5I, 5K, 5L (Nash).

37. USDA Ex. 5K (Nash); EPA Exs. 21, 21C–21F (Taylor); EPA Ex. 24 (Seba).

38. EPA Exs. 16, 16B, 16C (Cummings); USDA Ex. 5K (Nash).

39. Administrator's Opinion at 29; ALJ Recommended Decision at 86; EPA Ex. 43 (Mantel);

EPA Exs. 45, 45A at 16–17 (Schneiderman); Tr. 4948–53, 4967 (cross-examination of Carlborg); Tr. 8474–8482, 8525 (Mantel).

40. EPA Ex. 19 (Kutz); VCC Ex. 4A at 22, Tr. 3124, 7366–67 (Duggan).

41. Administrator's Opinion at 47.

conclude that the use of a pesticide in general is hazardous. Once the initial showing of hazard is made for one mode of exposure in a suspension proceeding, and the pesticide is shown to be present in human tissues, the burden shifts to the registrant to rebut the inference that other modes of exposure may also pose a carcinogenic hazard for humans.[42] Velsicol has totally failed to meet that burden here. Although it was put on notice in the Notice to Suspend of EPA's intent to rely on direct inhalation and dermal exposure as reasons to suspend household lawn and turf uses of chlordane, it failed to offer even a medical theory as to why the significant inhalation or dermal exposure associated with such uses would *not* pose a carcinogenic threat. In view of the general failure to understand the mechanics of carcinogenicity, the lack of hypothetical explanation may be based on Velsicol's own data that exposure to vapors of chlordane and heptachlor in the work place, leads (as dietary exposure leads) to storage of oxychlordane, heptachlor epoxide, and other components in the fat tissue, and to circulation of these compounds in the blood, with consequent exposure to other organs in the body.[43] Nor did Velsicol focus on the individual user's intense inhalation exposure associated with lawn and turf uses in its response to the point made in the EPA Staff's exceptions to the ALJ recommended decision, that the evidence showed that an individual using these chemicals for lawn and turf applications is subjected to a marked intensity of inhalation. Instead Velsicol attacked as in-

consistent with the minimal amounts of chlordane and heptachlor normally found in ambient air, the EPA Staff's proposed reliance on inhalation as a major route of human exposure for the general population. However, the Administrator did not proceed on this basis. And if Velsicol hypothesized that chlordane residues are safe so long as they reach the tissue only through inhalation (even intense inhalation) it should have presented witnesses expressing that hypothesis. Instead they argue, in general and procedural terms, that the evidence presented by the Administrator was not sufficient to meet his full burden, and this in our view seeks to impose a broader burden on the Administrator than is appropriate in a suspension proceeding.

### B. Benefits

Velsicol and USDA challenge the Administrator's finding that the benefits derived from the suspended uses of chlordane do not outweigh the harms done. EDF urges that the Administrator's decision to continue some uses was not justified by evidence that the risk of harm was outweighed by benefits from the continued uses.

### 1. Use on Corn

 Heptachlor and chlordane were used on an estimated 3.5% of the total corn acreage in the United States in 1975, largely in an effort to control black cutworm. Cutworms sporadically infest 2 to 8% of total U.S. corn farms, and occur most often in lowland, river bottom areas. Chlordane and heptachlor are used as preplant treat-

---

**42.** Velsicol asked this court to take judicial notice of the EPA's Interim Procedures & Guidelines for Health Risk and Economic Impact Assessments of Suspected Carcinogens, 41 Fed.Reg. 21402–05 (May 25, 1976), particularly § 3.5.3 that "[s]ome judgment should be included regarding relevance of the mode of exposure." In view of the no benefit finding from continued use of chlordane and heptachlor in household lawn and turf care, and the pesticides' characteristics of persistence, biomagnification and lipid solubility, that standard does not appear to have been violated here, although the Administrator was not explicit on the point. *Cf. EDF v. EPA*, 167 U.S.App.D.C. at 80, 510 F.2d at 1301.

**43.** VCC Ex. 36A. We note that the reliance placed by Velsicol on the Eighth Circuit's distinction between modes of exposure in *Reserve Mining* fails to take into account as well the very different chemical properties that characterize asbestos as opposed to the properties exhibited by heptachlor/chlordane. Unlike the pesticides at issue here, asbestos fibers are apparently not mobile or lipid soluble, so it was possible that the ingested asbestos—the exposure route where there was less evidence— would pass straight through the digestive tract rather than being retained. There was no comparable hypothesis advanced for the inhalation exposure route questioned here.

ments to insure against possible infestations. The Administrator found, with record support, that no macro-economic impact will occur as a result of suspending those pesticides. He also found that crop surveillance or "scouting" for infestations during the early weeks of plant growth, together with application of post-emergence baits or sprays where necessary, provide an effective alternative to the more indiscriminate prophylactic use of chlordane and heptachlor. Velsicol urges that this approach is not as effective as the persistent protection provided by chlordane. Especially in the absence of proof of a serious threat to the nation's corn, there is no requirement that a pesticide can be suspended only if alternatives to its use are absolutely equivalent in effectiveness. The Administrator reasonably took into account that a transition period would be necessary to implement post-emergent techniques of control and concluded that the challenged pesticides could continue in use for corn protection until August 1, 1976.[44] This evaluation of alternatives and the time required to implement them is supported by substantial evidence, and we find no basis to disturb the Administrator's balancing of costs and benefits.

### 2. Miscellaneous Agricultural Uses

The Administrator suspended a number of agricultural uses where the record was insufficient to support any finding that benefits outweigh costs of continued use of heptachlor or chlordane on these crops.[45]

44. EDF argues that it was illegal for the Administrator to delay implementation of his suspension on corn. Such a delay is specifically authorized by the FIFRA, 7 U.S.C. § 136m(b)(2), which provides that "the Administrator may provide a reasonable time for use or other disposal" of a suspended pesticide.

45. Velsicol also urges that the December 24, 1975, Order suspended agricultural registration of chlordane and heptachlor for corn pests alone, and that the Administrator lacked jurisdiction to issue the January 19th order it views as suspending for the first time more than 100 miscellaneous agricultural registrations of the pesticides. We reject that contention. The January 19th order merely clarifies the Decem-

Possibly the lack of benefits evidence reflected readily available alternatives, possibly a relative lack of interest in lesser-volume uses. In any event, the registrant's failure to carry its burden of adducing sufficient evidence on benefits in effect leaves the Administrator nothing to weigh in his cost-benefit analysis except the evidence that the use of the challenged pesticides in general is hazardous. That evidence of general hazard is sufficient to support a suspension of uses.

### 3. Non-Agricultural Uses Suspended by the Administrator

Chlordane is a common household, lawn, garden, and ornamental turf insecticide, with over 7.5 million pounds (36% of total use) so employed in 1974. The ALJ and Administrator found on the basis of substantial evidence that the "efficaciousness of the substitutes for control of household and lawn insects is not really at issue"[46] and that when lack of evidence of substantial benefits from continued use is weighed against the special hazards of exposure presented by the possibilities of inhalation, dermal absorption, and the increased dangers associated with improper handling, suspension of those uses was justified. Similarly, on the basis of evidence in the record, the Administrator could reasonably find that the residual capacity of chlordane was not necessary to control either structural pests or ticks and chiggers, given the existence of effective alternatives to each of those uses.[47]

ber 24th order. The Administrator's December 24th decision noted that the ALJ determined that uses of which no benefits evidence was presented should be suspended. We cannot read the December 24th order as contemplating continued use of hazardous pesticides in the absence of any reliable record evidence of benefits to be derived from continued use.

46. ALJ Recommended Decision at 102, EPA Ex. 26 at 32–34, Ex. 26T, NPCA Ex. 1–5. There is of course no requirement that substitutes for suspended pesticides be absolutely equivalent in effectiveness for a particular use.

47. Administrator's Opinion at 36, 48.

### 4. The Administrator's Refusal to Suspend Certain Uses

EDF challenges the Administrator's refusal to suspend use of chlordane or heptachlor on strawberries, for seed treatment, pineapples, the white fringed beetle, Florida citrus, white grubs in Michigan, narcissi bulbs, harvester ants, imported fire ant, Japanese beetle quarantine, and black vine weevil quarantine in Michigan. Following the recommendations of the ALJ, the Administrator found that for each use the benefits outweighed the risks for the limited time under consideration, effective alternatives were generally not available, and that the exposure risk arising from the use was minimal. EDF counters that the total exposure resulting from these "minor" uses is in fact significant, and that the Administrator continued these uses whenever a "colorable" case of benefits had been made out.

 Once the Administrator has found that a risk inheres in the use of a pesticide, he has an obligation to explain how the benefits of continued use outweigh that risk. We are satisfied that he has met that obligation here, and that substantial evidence supports his decision. We note, however, that we come to this conclusion in the context of a suspension proceeding where perforce the Administrator is engaged in making a "preliminary assessment" of the evidence; a more careful exploration of economic impact and available alternatives would be required to support continued registration in a cancellation proceeding.

### C. Continued Sale and Use of Existing Stocks of Chlordane and Heptachlor for Suspended Uses

 Although we have no doubt that the Administrator has the power under FIFRA to exempt from a suspension order the use of existing stocks (in this case stocks existing as of July 29, 1975), the Administrator acted arbitrarily when he failed to even inquire into the amount of stocks left, and the problem of returning and disposing

of them. Some evidence must be adduced before an exemption decision is made, and it is the responsibility of the registrant to provide it.[48] It may be that the lapse of time has lessened the current significance of this issue but we are in no position to do other than remand for further consideration.

We affirm the Agency's suspension order of December 24, 1975, as clarified by the order of January 19, 1976, except for the exemption of the sale and use of existing stocks. The record is remanded for further consideration of that issue.

*So ordered.*

### Supplemental Opinion on Petition for Rehearing
### ORDER

On consideration of the petition of Velsicol Chemical Corporation for rehearing it is

ORDERED by the Court that the aforesaid petition for rehearing is denied.

Supplemental Opinion for the Court filed by Circuit Judge LEVENTHAL.

### SUPPLEMENTAL OPINION ON PETITION FOR REHEARING

LEVENTHAL, Circuit Judge:

Velsicol argues in its petition for rehearing that in upholding the Administrator's allocation of the burden of proof to the registrant this Court misinterpreted § 7(c) of the Administrative Procedure Act. Velsicol points out that the interpretation adopted by this Court was not advanced by any of the parties and that, in fact, the problem of interpreting the APA—as opposed to section 6(c)(2) of FIFRA—was not briefed or argued in this proceeding.

In light of these contentions, we have reexamined our analysis of the APA and FIFRA. After further study, we are still of the view that the Administrative Procedure Act does not preclude the assignment of the burden of persuasion to the opponent

---

**48.** Some evidence on this question has since been made available to this court by Velsicol, but we do not consider ourselves in a position to evaluate it.

of an order. So far as this case is concerned, however, Velsicol's position is undermined by still another doctrine, that in any event the controlling statute is FIFRA. We hold that in light of the legislative history of FIFRA, and the numerous cases holding that its 1964 amendment was specifically intended to shift the burden of proof from the Secretary to the registrant, this case is one where the location of the burden of proof is, in the language of the APA, "otherwise provided by statute." 5 U.S.C. § 556(d).

I

As to the APA, our opinion holds that the "burden of proof" it casts upon the "proponent" is the burden of coming forward with proof, and not the ultimate burden of persuasion.

Velsicol claims that the precedents of this Circuit [1] and case law in other circuits [2] establish that under the APA the proponent of an order bears the burden of persuasion.

We have examined the cited cases and find no support for that view. Time does not permit discussion of each case. We shall refer to a few as illustrations.

Velsicol calls attention to *National Airlines, Inc. v. Civil Aeronautics Board*, 112 U.S.App.D.C. 119, 300 F.2d 711 (1962). There we affirmed an order that held that once a complaining City had demonstrated the inadequacy of existing airline service, the airline bore the burden of proving the economic infeasibility of expanding service. The court explained:

> Petitioner argues that the Administrative Procedure Act, § 7(c), 60 Stat. 241 (1946), 5 U.S.C.A. § 1006(c), which places the burden of proof upon the proponent of an order, prohibits the Board from placing the burden of proving economic infeasibility upon the carriers. We think that once the Board has established that existing service is inadequate to meet the needs of a community, it has discharged its burden of proof. Economic infeasibility is more like an affirmative defense than an element of the Board's case. Accordingly we think that the Board properly placed the burden of producing evidence of economic infeasibility upon petitioner.

112 U.S.App.D.C. at 123 n. 12, 300 F.2d at 715 n. 12. Far from indicating that the APA governs allocation of the burden of persuasion, this passage indicates that it was the burden of producing evidence that was the central concern of the APA.[3]

Our examination of the precedents cited from other Circuits has similarly failed to disclose a case holding that under the APA the proponent of an order bears the burden of persuasion. Most of the cases cited by Velsicol appear to think of "burden of proof" as the burden of producing evidence. *See, e. g., N.L.R.B. v. Atlanta Coca-Cola*

---

**1.** Velsicol cites *National Airlines, Inc. v. C.A.B.*, 112 U.S.App.D.C. 119, 123 n. 12, 300 F.2d 711, 715 n. 12 (1962); *Schramm v. Physical Therapists Examining Board*, 129 U.S.App.D.C. 347, 394 F.2d 972 (1967), *cert. denied*, 390 U.S. 987, 88 S.Ct. 1181, 19 L.Ed.2d 1289 (1968), *aff'g*, 219 A.2d 846 (D.C.C.A. 1966); *Philadelphia Co. v. S.E.C.*, 84 U.S.App.D.C. 73, 175 F.2d 808 (1948), *vacated as moot*, 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715 (1949).

**2.** Velsicol cited *United States v. Springer*, 491 F.2d 239, 242 (9th Cir. 1974); *Day v. National Trans. Safety Board*, 414 F.2d 950 (5th Cir. 1969); *N.L.R.B. v. Atlanta Coca-Cola Bottling Co.*, 293 F.2d 300 (5th Cir. 1961); *Kerner v. Flemming*, 283 F.2d 916, 921–22 (2d Cir. 1960); *Kirby v. Shaw*, 358 F.2d 446, 449 (9th Cir. 1966).

**3.** The other decisions of this Circuit do not detract from this conclusion. In *Philadelphia Co. v. S.E.C., supra* at note 1, the SEC had undertaken action with respect to the company by amending its Rules. It had not apprised the company of the facts upon which its action was based, "and it failed to introduce or receive evidence, to hear witnesses, to permit cross-examination, and to make a proper transcript of record." 175 F.2d at 818. It was in this context—in the total absence of an adjudicatory hearing—that we held that the Commission had "erroneously failed to assume the burden of proof in respect of the propriety of its proposed action." *Id.* In *Schramm v. Physical Therapists Board, supra*, at note 1, we upheld a decision of the D.C. Court of Appeals which found that an applicant had failed to meet her statutory duty of "present[ing] evidence" of her qualifications. 219 A.2d at 847.

*Bottling Co.,* 293 F.2d 300 (5th Cir.) rehearing denied, 296 F.2d 896 (1961); *United States v. Springer,* 491 F.2d 239, 242 (9th Cir.) *cert. denied,* 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974); *Kirby v. Shaw,* 358 F.2d 446 (9th Cir. 1966).[4] The one case cited by Velsicol that is explicitly concerned with the "burden of persuasion" is *Kerner v. Flemming,* 283 F.2d 916, 921–22 (2d Cir. 1960). Judge Friendly assumed arguendo ("We may agree") that under the APA and the Social Security Act "an applicant for a disability pension has the ultimate burden of persuasion." This did not govern the result, for the court did not affirm the denial of benefits but remanded for the taking of further evidence.[5]

As for *American Trucking Associations v. United States,* 344 U.S. 298, 319, 73 S.Ct. 307, 319, 97 L.Ed. 337 (1953), in holding that § 7(c) of the APA did not apply to the proceedings in suit, the Court merely put it as an assumption for sake of discussion:

> But even assuming that the Commission was a statutory "proponent" of the regulation and that it did not actively introduce the requisite degree of proof in support of its position, we think it plain that the requirement is inapplicable to the instant proceedings.

Our further research outside our circuit has yielded *Old Ben Coal Corp. v. Interior Bd. of Mine Operations Appeals,* 523 F.2d 25 (7th Cir. 1975), involving a situation and a ruling like ours. Appellants challenged a regulation that placed on the mine owner the burden of proving by a preponderance of the evidence the invalidity of the imminent danger withdrawal orders issued against him. The court held that in its view the Government bore the initial burden of going forward with the evidence, but

that once it had presented a *prima facie* case, the mine owner would be required to bear the "ultimate burden of proof." 523 F.2d at 30.[6] The Court explained:

> In practice . . . the burden of proof is split, with the Government bearing the burden of going forward, and the mine operator bearing the ultimate burden of persuasion. We think that this accords with the intent of Congress as expressed in the . . . Committee comment on section 7(c) of the Administrative Procedure Act (now codified as 5 U.S.C. § 556(d)) [citations omitted]

The legislative history of § 7(c) of the APA confirms the Seventh Circuit's interpretation. We set out the whole of the pertinent paragraph of the Senate Committee Report:[7]

> That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain. Similarly the requirement that no sanction be imposed or rule or order be issued except upon evidence of the kind specified means that the proponents of a denial of relief must sustain such denial by that kind of evidence. For example, credible and credited evidence submitted by the applicant for a license may not be ignored except upon the requisite kind and quality of contrary evidence. No agency is authorized to stand mute and arbitrarily disbelieve credible evidence. Except as applicants for a license or other privilege may be required to come forward with a prima facie showing, no agency is entitled to

---

4. In *Atlanta Coca-Cola,* for example, the court was concerned with the General Counsel's failure to produce evidence of discriminatory intent as to each of the individual employees, rather than with the placement of the burden of persuasion. *See, e. g.,* 293 F.2d at 309 ("This is not a case where conflicting inferences of equal weight may be drawn from the record.")

5. That the court did not intend this passage to state doctrine with respect to the allocation of

the burdens of proof or persuasion is indicated by its appended footnote 8, which stated "Congress has often spoken far more clearly when it has desired to fix a burden of proof. [citing statutes]."

6. Judge Pell dissented.

7. S.Rep.No.752, 79th Cong., 1st Sess. 22 (1945), *reprinted* in S.Doc. 248 at 208.

presume that the conduct of any person or status of any enterprise is unlawful or improper.

Plainly, this is all concerned with the proponents being required to shoulder the burden of producing evidence.

The House Report [8] fully confirms this view. It contains the language quoted above from the Senate Report, and summarizes its effect:

> In other words, *this section means that every proponent of a rule or order or the denial thereof has the burden of coming forward* with sufficient evidence therefor; and in determining applications for licenses or other relief any fact, conduct, or status so shown by credible and credited evidence must be accepted as true except as the contrary has been shown or such evidence has been rebutted or impeached by duly credited evidence or by facts officially noticed and stated. (Emphasis added).

Velsicol points out that an earlier version of S.7 had provided:

> The proponent of a rule or order shall have the burden of proceeding except as statutes otherwise provide." (S.Doc. 248, 79th Cong., 2d Sess. 11, 158, 300 (1945)).

A Senate Judiciary Print comparing the earlier and later versions of the bill stated:

> The provision relating to burden of proof is the standard rule. Senate Doc. 248 at page 31.

Velsicol contends that this change in language was intended to make clear that the proponent of an order would also bear the burden of persuasion.

This argument is more revealing of the ingenuity of counsel than of the intent of Congress. If the language of the bill had been deliberately changed to govern placement of the burden of persuasion, the Committee reports accompanying the bill would have made that point.

Lastly, we note that our interpretation of § 7(c) is supported by the *Attorney General's Manual on the Administrative Procedure Act*, published in 1947 "primarily as a guide to the agencies in adjusting their procedures to the requirements of the Act." (Intro. by Att. Gen. Tom Clark, page 6). The *Manual* does not mention the change in language as bearing on location of the burden of persuasion. On the contrary, it states (at p. 75):

> There is some indication that the term "burden of proof" was not employed in any strict sense, but rather as synonymous with the "burden of going forward". In either case, it is clear from the introductory clause that this general statement was not intended to repeal specific provisions of other statutes which, as by establishing presumptions alter what would otherwise be the "burden of proof" or the "burden of going forward".

## II

■ Section 7(c) of the APA provides that the proponent of a rule or order shall have the burden of proof "[e]xcept as otherwise provided by statute." Because we held in our panel opinion that § 7(c) was not intended to govern the allocation of the burden of persuasion, we found it unnecessary to decide whether suspension hearings held under FIFRA might not qualify as a situation where the location of the burden of proof was "otherwise provided by statute." Velsicol's challenge has led us to focus again on the problem. We have examined the relationship between FIFRA and the APA and conclude that suspension hearings do indeed fall within the exceptions to § 7(c).

This court has repeatedly held that the 1964 amendments to FIFRA were specifically intended to shift the burden of proof from the Secretary (now the Administrator) to the registrant. *EDF v. Ruckelshaus*, 142 U.S.App.D.C. 74, 93, 439 F.2d 584, 593 (1971); *EDF v. EPA [Aldrin and Dieldrin]*, 150 U.S.App.D.C. 348, 465 F.2d 528, 532 (1972); *EDF v. EPA [Shell Chemical Co.]*, 167 U.S.App.D.C. 71, 76, 510 F.2d 1292, 1297 (1975). In *EDF v. Ruckelshaus, supra*, the court explained:

---

8. H.R.Rep.1980, 79th Cong., 2d Sess. 34 (1946), *reprinted in* S.Doc. 248 at 270.

Prior to 1964, the FIFRA required the Secretary to register "under protest" any pesticide or other item that failed to meet the statutory requirements. The product remained on the market, and the Secretary reported the violation to the United States Attorney for possible prosecution. In 1964 the statute was amended to eliminate the system of protest registration, and substitute the present administrative mechanism for cancelling registrations. The stated purpose of the amendment was to protect the public by removing from the market any product whose safety or effectiveness was doubted by the Secretary.

The House Committee Report accompanying the bill specifically stated:

> The principal effect of registration under protest is to shift the burden of proof from the registrant to the Government. If the product is not registered, the penalty or seizure provisions can be applied on that ground. If it is registered under protest, the Government has the burden of proving that the product does not comply with the act.

> Thus, at present, the Secretary can be required to register a product even though he is convinced that it is ineffective and dangerous to human life. He can proceed against it in such case only after it has moved in interstate commerce, and he then has the burden of proving that it violates the law. The bill would correct this situation and afford greater protection to the public by repealing the authority for registration under protest. In its place the bill provides that applicants dissatisfied with the Secretary's action in refusing or canceling registration may have recourse to advisory committee proceedings, public hearings, and eventually judicial review. Thus the bill affords adequate protection to the public, and protects applicants for registration from arbitrary or ill-advised action by the Department.

H.R.Rep.No.1125, 88th Cong., 1st Sess. 2 (1964). Thus, we found that "[t]he legislative history supports the conclusion that Congress intended any substantial question of safety to trigger the issuance of cancellation notices, shifting to the manufacturer the burden of proving the safety of his product." 142 U.S.App.D.C. at 93, 439 F.2d at 593.[9]

Subsequent decisions reaffirmed this interpretation. In the 1972 *EDF* case, we said (150 U.S.App.D.C. at 352, 465 F.2d at 532):

> The burden of establishing the safety of a product requisite for compliance with the labeling requirements, remains at all times on the applicant and registrant.

In the 1975 *EDF* case, 510 F.2d at 1297, we reiterated this principle in the context of a challenge to a suspension order. Other circuits have similarly concluded that the registrant bears the burden of proof. *E. g., Dow Chemical Co. v. Ruckelshaus,* 477 F.2d 1317, 1324 (8th Cir. 1973); *Southern Nation-*

---

**9.** We quoted in a footnote from additional legislative history:

> 34. *See* 110 Cong.Rec. 2948–49 (1964) (remarks of Congresswoman Sullivan):
> I am strongly in favor of the legislation now before you to require industry, rather than the Federal Government, to shoulder the burden of proof in connection with the marketing of pesticides which may be unsafe for use as intended.
>
> \* \* \* \* \* \*
>
> The burden of proof should not rest on the Government, because great damage can be done during the period the Government is developing the data necessary to remove a product which should not be marketed.
> *See also* H.R.Rep.No.1125, *supra*; S.Rep.No. 573, 88th Cong., 2d Sess. (1964). Our con-

struction of the FIFRA also finds strong support in a 1969 report of the House Committee on Government Operations, reviewing the administration of the statute. The Committee strongly criticized the administrators for failing to take "prompt or effective cancellation action in cases where it had reason to believe a registered product might be ineffective or potentially hazardous. \* \* \* A mistaken belief that positive evidence of hazard—rather than simply a lack of adequate assurance of safety—is necessary to support a cancellation action appears to have been a factor in [the] failure to initiate such action in cases where it was obviously justified." H.R.Rep.No.91–637, 91st Cong., 1st Sess. 15–16 (1969).

al Mfg. Co. v. EPA, 470 F.2d 194, 196–97 (8th Cir. 1973); Continental Chemiste Corp. v. Ruckelshaus, 461 F.2d 331, 335 (7th Cir. 1972); Stearns Electric Paste Co. v. EPA, 461 F.2d 293, 303 (7th Cir. 1972).

Velsicol argues that the 1972 Amendments to FIFRA, which provided that a suspension hearing "shall be held in accordance with the provisions of subchapter II of Chapter 5 of Title 5", operated to shift the burden of proof to the agency. See FIFRA § 6(c)(2), 7 U.S.C. § 136d(c)(2) (Supp. V 1975). In light of the clarity with which Congress originally undertook to fix the burden of proof (persuasion) on the registrant, and the firmness of the courts' interpretation of the 1964 amendment,[10] we cannot believe that the general incorporation of APA standards 1972 was intended to shift the burden of proof away from the registrant sub silentio.[11] As the ALJ pointed out, "It would be strange indeed, that the 1972 amendment to the act would change the cornerstone of the statute without mention." ALJ Recommended Decision at 73, n. 12. This conclusion would be sound even if the APA, by itself, indisputably put the burden of persuasion on the proponent of suspension. It is strengthened by our conclusion (Part I) that the APA does not have that consequence.

Lastly, we do not discern in the statute an allocation of burden of proof that is different for suspension hearings than for registration or cancellation proceedings. While the suspension proceeding is in progress, the public is subject to the same risks of injury that are present in the cancellation context, the very risks which caused Congress to shift the burden of proof to the registrant in the original registration. Information relevant to the safety issues is—or should be—in the possession of the manufacturer. Cf. Commonwealth of Puerto Rico v. Federal Maritime Comm'n, 152 U.S.App.D.C. 28, 468 F.2d 872 (D.C.Cir. 1972). We agree with Judge, now Justice, Stevens that: "If a presumption of proper use at the end of a 5-year period does not shift the burden of proof in the [re-registration situation], we think there is even less reason to shift the burden in the middle of a 5-year term if the Administrator should then become aware of previously unknown risks associated with the use of a product." Stearns Electric Paste Co. v. EPA, supra, 461 F.2d at 305 n. 38 (7th Cir. 1972). To place the burden of proof on the agency in suspension hearings would not be a reasonable construction of FIFRA.

Our view that this case is one in which the allocation of the burden of proof is controlled by the scheme of FIFRA rather than by the APA is firmly supported by, and interrelated with, the doctrine set forth in Commonwealth of Puerto Rico v. Federal Maritime Comm'n, supra, that the general rule imposing the burden of proof on the proponent of an order is "subject to reasonable construction and limitation." 152 U.S. App.D.C. at 37, 468 F.2d at 881. The governing statute in that case provided that the burden of proof was to be borne by the carrier in a proceeding in which the proposed rates had been suspended, but did not explicitly provide for the case where the

---

10. Significantly, our decisions had made clear that the registrant bore the burden of proof in suspension hearings even before the 1972 Amendments had been enacted. Our 1971 decision in EDF v. Ruckelshaus noted:

> Because the statute places on the manufacturer the burden of proving the continued safety of his products, see note 34 infra, an administrative order of suspension is entitled to greater judicial deference than an order denying suspension.

142 U.S.App.D.C. at 92 n. 22, 439 F.2d at 592 n. 22.

Our statement in EDF v. EPA, 150 U.S.App. D.C. at 352, 465 F.2d at 532, that the burden of proof was "at all times on the applicant and registrant" came 6 months before the enactment of the amendments to FIFRA. The decision of the Seventh Circuit that the registrant bore the burden of proof in suspension proceedings similarly preceded the passage of the Act by 6 months. See Stearns Electric Paste Co. v. EPA, 461 F.2d 293 (7th Cir. 1972).

11. Velsicol has not cited nor have we found any statements in the legislative history suggesting that the incorporation of APA standards for suspension hearings was intended to shift the burden of proof.

Commission permitted the rates to go into effect. We held that even in the absence of explicit statutory guidance, the burden of proof was to be borne not by the shipper proposing a termination of the existing rate, but by the carrier defending that rate and the increases it wrought. In support of this conclusion we noted the general regulatory pattern and the fact that the carriers were the parties "naturally possessed of pertinent evidence." Both of those considerations are relevant with respect to the burden of proof in FIFRA suspension hearings.

\* \* \* \* \* \*

In summary, we find that in a suspension hearing conducted under FIFRA § 6(c)(2), the burden of persuasion rests ultimately on the registrant. In its 1964 amendment to the Act, Congress made clear that the public was not to bear the risk of uncertainty concerning the safety of a covered poison. In the absence of an equally explicit countermanding direction from Congress, we will not force the public to assume it.